UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

TRESTON RAYAL JONES,                    )     Case No. CV 13-5642-JEM
                                        )
              Petitioner,               )
                                        )
       v.                               )     MEMORANDUM OPINION AND ORDER
                                        )     DENYING PETITION FOR WRIT OF
JEFFREY A. BEARD, et al.,                )     HABEAS CORPUS
                                        )
              Respondent.               )
                                        )
_____ )

**PROCEEDINGS**

On August 5, 2013, Treston Rayal Jones ("Petitioner"), a prisoner in state custody,
filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 ("Petition"),
and a supporting Memorandum of Points and Authorities ("Memo."). On December 11,
2013, Respondent filed an Answer to the Petition. Petitioner did not file a Reply.

The parties have consented to proceed before the Magistrate Judge.

**BACKGROUND**

In January 2012, in the Los Angeles County Superior Court, a jury found Petitioner
guilty of one count of first degree burglary (Cal. Penal Code § 459) and four counts of first
degree residential robbery (Cal. Penal Code § 211) and found true five gang enhancement

1  special allegations. (Cal. Penal Code § 186.22(b)(1)(C)). (Respondent's Lodged Documents

2  ("LD") 1 at 191-200.)  In a bifurcated proceeding, Petitioner admitted he had suffered a prior

3  serious felony conviction. (LD 1 at 206; LD 2 Reporter's Transcript ("RT") at 1802-04.) The

4  trial court sentenced him to forty-six years in state prison. (LD 1 at 207-11, 215.)

5        Petitioner appealed to the California Court of Appeal, which affirmed the judgment in

6  a written decision on February 22, 2013. (LD 3-7.) He then filed a petition for rehearing,

7  which the court denied on March 12, 2012. (LD 8-9.) Petitioner filed a petition for review in

8  the California Supreme Court, which was summarily denied on May 22, 2013. (LD 10-11.)

9                    **SUMMARY OF EVIDENCE AT TRIAL**[1]

10        About 7:50 a.m. on February 17, 2011, defendant and another

11        man entered the Lancaster home of Lashawn Blaylock, her husband

12        Jesse Blaylock, their children Viviana and Vincent, and Lashawn's

13        18–year–old daughter Lashawnda Scales. Jesse had just left the home

14        to drive Viviana to school. The person with defendant was taller and

15        had a gun. Lashawn saw him first and asked, "Who are you?" The man

16        with the gun said, "It's a robbery." Defendant moved Lashawn, Scales,

17        and Vincent into a bathroom, told them to stay there, and closed the

18        door. Lashawn testified that Vincent was five years old, while Jesse

19        testified that Vincent was four years old. Defendant returned to the

20        bathroom numerous times, opened the door to check on them, and

21        warned them not to escape. Lashawn saw defendant's face each time

22  _____

23        [1]  The Court quotes directly from the California Court of Appeal's statement of facts in its opinion
       affirming Petitioner's conviction. The Court "presume[s] that the state court's findings of fact are correct
24     unless Petitioner rebuts that presumption with clear and convincing evidence. Petitioner has not . . .
       overcome the presumption with respect to the underlying events.  [The Court] therefore rel[ies] on the
25     state court's recitation of the facts."  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008) (citations
       omitted), cert. denied, 555 U.S. 1112 (2009); 28 U.S.C. § 2254(e)(1).  "This presumption is not altered
26     by the fact that the finding was made by a state court of appeals, rather than by a state trial court."
       Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by, 253 F.3d 1150 (9th Cir. 2001);
27     Pollard v. Galaza, 290 F.3d 1030, 1035 (9th Cir.), cert. denied, 537 U.S. 981 (2002).

28                                        2

he returned. She knew she recognized him, but could not remember the context. Scales also thought defendant, who wore a "ring" in his pierced tongue, looked familiar.

While they were confined in the bathroom, Lashawn tried to comfort Vincent and Scales. Scales wanted to either escape through the bathroom window herself or put Vincent through the window to "go get help," but Lashawn talked her out of it because she feared the robbers would become violent if they noticed that one of the captives had escaped. At one point, defendant's companion "snatched" Lashawn from the bathroom and demanded to know where the money and safe were. Defendant and his companion referred to one another as "Blood," and one of them mentioned the name of Lashawn's son, Russell, who was in jail.

Jesse arrived home about 8:05 a.m. He noticed that the front door was open and its glass was cracked. Defendant's companion immediately confronted Jesse, told him it was a robbery, and asked him where the safe was. Jesse told the man that they had no safe. As defendant's companion pushed Jesse down a hallway, defendant "popped out" of the bathroom. Jesse recognized defendant from an encounter the night before in which defendant had knocked on the front door of Jesse's house. Jesse had not opened the door, but instead spoke to defendant through the adjacent kitchen window. Defendant had turned to face that window and had asked Jesse if Jessica was there. Jesse had gotten a good view of defendant's face the night before because the porch light was on and defendant was facing him. Jesse also testified that defendant's tongue was pierced and he wore a "tongue ring."

After defendant "popped out" of the bathroom, he got in front of Jesse and asked where the safe was. Jesse got a good view of defendant's face. Defendant's companion held Jesse by the collar while defendant ransacked the house. Defendant pulled Lashawn from the bathroom and asked her where the safe was. Defendant and his companion forced Jesse and Lashawn to disrobe and go into the master bathroom. Eventually the robbers left, taking currency and coins, jewelry, two mobile phones, and the house and car keys. Jesse testified the robbery lasted 15 to 25 minutes, Scales testified it lasted 30 minutes, and Lashawn testified it lasted more than 30 minutes.

Scales phoned 911 and reported the robbery. She told the operator that she had gotten a good look at the two men, whom she described as Black males in their twenties. (Defendant was 23 on the date of the charged crimes.) She stated that one of them had a mustache, beard, and a tongue ring, but she did not say anything about a tattoo. Jesse also spoke to the operator and stated he also got a good look at the robbers and recognized one of them as the man who had come to his door the night before asking for Jessica. Scales asked Jesse, "The one with the tongue ring?" Jesse replied, "Yep. It was him. He's the one who knocked on the door last night."

Scales told one of the responding sheriff's deputies that she recognized defendant from seeing him before, "but she wasn't sure from where." Lashawn testified that sometime after the robbery she remembered that she had seen defendant in the company of her son Russell on two occasions before the robbery: once at a market and once sitting in Russell's car when it was parked outside Lashawn's house. She also remembered that defendant had repeatedly asked her to be his friend on Facebook and had also asked if she wanted to

1   purchase some food stamps. Lashawn logged onto Russell's Facebook
2   account and found photographs of defendant. Scales printed the
3   photographs and also e-mailed them to a detective. Three of these
4   photographs were introduced in evidence at trial. One of them showed
5   defendant with a stud-type of jewelry in his tongue and another piercing
6   extending across his chin just below his lower lip. The stud was what
7   Scales was referring to as "a tongue ring" when she spoke to the 911
8   operator. Scales also remembered seeing defendant with Russell at the
9   Blaylock house and knew that defendant had sent her mother
10  Facebook friend requests. She also saw the other robber among
11  defendant's Facebook friends.

12          Jesse testified he looked at the Facebook photographs and
13  immediately recognized defendant as the person who had come to
14  Jesse's door the night before the robbery asking for Jessica and
15  returned the next day to rob him. The tongue stud depicted in the
16  prosecution exhibit showing piercings was what Jesse referred to as a
17  "tongue ring."

18          Jesse and Lashawn testified that before Russell went to jail, he
19  had posted on Facebook a photograph of himself in which he had a
20  large stack of $1 bills topped with a couple of large denomination bills,
21  so that it looked like he had a lot of money.

22          About 10 days after the crimes, Detective Roger Izzo individually
23  interviewed Jesse, Lashawn, and Scales and showed each a
24  photographic array. Each one selected defendant's photograph in the
25  array. Lashawn wrote that defendant's photograph was "most similar" to
26  the robber's. She explained that the photograph of defendant in the
27  array was dark. Jesse told Izzo that defendant's photo was "closest to"
28  depicting the robber because the photograph in the array was small and

of poor quality. Scales wrote "100%" next to defendant's picture on the photographic array because she was certain that he was the shorter robber. We have reviewed the arrays shown to the victims and note that defendant's photograph does not show his tongue ring or facial piercing, and the lighting in his photograph is quite poor.

Jesse, Lashawn, and Scales identified defendant at the preliminary hearing and trial as the shorter robber, not the taller one with the gun. Jesse was asked at trial whether he could see a tattoo on defendant's neck and said he could not.

Although the robbers were not wearing gloves and various surfaces in the Blaylock house were dusted for fingerprints, no fingerprints that were sufficiently complete for comparison were obtained. Izzo did not try to trace the location of the stolen phones because by the time he got the case, the victims had already terminated service on those phones.

Sergeant Mark Machanic of the Los Angeles County Sheriff's Department testified that defendant had admitted his membership in the Bloods on Point gang to Machanic on four or five occasions. Detective Richard Cartmill, the prosecution's gang expert, testified that Bloods on Point was a Bloods gang in the Antelope Valley. Its members were known to refer to one another as "Blood." The gang began as a "burglary crew in Palmdale," and "door-kick residential burglaries" were one of the gang's primary activities. In response to a hypothetical question based upon the prosecution's evidence, Cartmill opined that the burglary and robberies described in the question were committed for the benefit of the Bloods on Point gang because news of the brazen daytime residential takeover would spread through the community and cause intimidation, thus enabling the gang to commit more crimes

because the public would not report crimes or resist the gang. In addition, the gang would be entitled to a share of the proceeds from the robbery.

Defendant's grandmother Brenda Green testified that defendant was living with her in Los Angeles at the time of the charged crimes and she recalled that he was at the house the entire week of Valentine's Day, 2011. He would have been either in the house or in the backyard at the time of the charged crimes.

The parties stipulated that if defendant's cousin Tyren Green were called as a witness, he would testify that defendant got the tattoo on his neck in January of 2011.

Dr. Mitchell Eisen testified for the defense as an expert on eyewitness identification. He testified that a variety of circumstances can affect the accuracy of a witness's identification: distractions; stress and trauma; source confusion; facial features; unique identifying features such as piercings or tattoos; the length of exposure; prior familiarity; confusing a stranger associated with the event with the perpetrator; accepting information from someone else after the event; and attributes of the identification testing, such as the presence or absence of an admonition, experimenter bias, and seeing the same person in multiple identification tests. He further testified that a witness becomes more confident of the accuracy of his or her identification over time, but a witness's confidence did not necessarily correlate with his or her accuracy. In-court identifications are too temporally removed to constitute an identification test; they are instead assertions of a witness's belief. Eisen nonetheless conceded that witnesses "can and do [make] accurate identifications all the time."

1    The jury convicted defendant of first degree burglary and four
2    counts of first degree robbery (pertaining to Jesse, Lashawn, Scales,
3    and Vincent), and found that each crime was committed for the benefit
4    of, at the direction of, or in association with a criminal street gang, with
5    the specific intent to promote, further, or assist in criminal conduct by
6    gang members. The jury found not true the allegations that a principal
7    personally used a gun in the commission of each offense. Defendant
8    admitted that he had one prior serious or violent felony conviction
9    constituting a "strike." The court sentenced defendant to 46 years in
10    prison, consisting of second strike terms of 12 years for burglary, plus
11    10 years for the gang enhancement, and four consecutive terms of 6
12    years for each robbery with the gang enhancement.

13 (LD 7 at 2-6.)

14                          **PETITIONER'S CONTENTIONS**

15       1.  The trial court violated Petitioner's due process right to present a defense when it
16 excluded "all . . . evidence that the eyewitnesses may have misidentified the other robbery
17 suspect." (Petition at 5;[2] Memo. at 1-4.)

18       2.  The trial court violated Petitioner's Sixth Amendment right to confrontation by not
19 permitting him to confront the eyewitnesses with evidence that they might have misidentified
20 the second robber.  (Petition at 7; Memo. at 4-5.)

21       3.  There was insufficient evidence to sustain Petitioner's conviction for robbing
22 Vincent B.[3]  (Petition at 8; Memo. at 5-6.)

23 / / /

24 / / /

25 / / /

26 _____

27       [2] For ease of reference, the Court labels and refers to the pages in the Petition in consecutive order.

28       [3] Petitioner erroneously refers to "Vincent", the four- or five-year-old son of Lashawn and Jesse
Blaylock, as "Justin" in the Petition.  (RT at 613, 658.)

**STANDARD OF REVIEW**

1

2       The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the

3  Court's consideration of Petitioner's cognizable federal claims.  28 U.S.C. § 2254(d), as

4  amended by AEDPA, states:

5          An application for a writ of habeas corpus on behalf of a person in custody

6          pursuant to the judgment of a State court shall not be granted with respect to

7          any claim that was adjudicated on the merits in State court proceedings unless

8          the adjudication of the claim – (1) resulted in a decision that was contrary to,

9          or involved an unreasonable application of, clearly established Federal law, as

10         determined by the Supreme Court of the United States; or (2) resulted in a

11         decision that was based on an unreasonable determination of the facts in light

12         of the evidence presented in the State court proceeding.

13      In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court held

14 that a state court's decision can be contrary to federal law if it either (1) fails to apply the

15 correct controlling authority, or (2) applies the controlling authority to a case involving facts

16 materially indistinguishable from those in a controlling case, but nonetheless reaches a

17 different result.  Id. at 405-06.  A state court's decision can involve an unreasonable

18 application of federal law if it either (1) correctly identifies the governing rule but then applies

19 it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to

20 extend a clearly established legal principle to a new context in a way that is objectively

21 unreasonable.  Id. at 407-08.  The Supreme Court has admonished courts against equating

22 the term "unreasonable application" with "clear error."  "These two standards . . . are not the

23 same.  The gloss of clear error fails to give proper deference to state courts by conflating

24 error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75

25 (2003).  Instead, in this context, habeas relief may issue only if the state court's application

26 of federal law was "objectively unreasonable."  Id.  "A state court's determination that a

27 claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

28

9

1    disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct.

2    770, 786 (2011).

3        Under AEDPA, the "clearly established Federal law" that controls federal habeas

4    review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court

5    decisions "as of the time of the relevant state-court decision." Williams, 529 U.S. at 412 ("§

6    2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence"); see

7    also Andrade, 538 U.S. at 71. If there is no Supreme Court precedent that controls a legal

8    issue raised by a habeas petitioner in state court, the state court's decision cannot be

9    contrary to, or an unreasonable application of, clearly established federal law. Wright v. Van

10    Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70,

11    76-77 (2006). A state court need not cite or even be aware of the controlling Supreme

12    Court cases, "so long as neither the reasoning nor the result of the state-court decision

13    contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Bell v. Cone,

14    543 U.S. 447, 455 (2005) (per curiam).

15        Petitioner raised the claims in the instant Petition in his petition for review in the

16    California Supreme Court.[4] (LD 10). The California Supreme Court's discretionary decision

17    to deny Petitioner's petition for review without comment or citation to authority was not a

18    decision on the merits. (See LD 11); Greene v. Fisher, 132 S.Ct. 38, 45 (2011) (state

19    supreme court's decision not to hear an appeal is not an adjudication on the merits under §

20    2254(d)(1)); Williams v. Cavazos, 646 F.3d 626, 636 (9th Cir. 2011), cert. granted in part,

21    132 S.Ct. 1088 (2012) ("[T]he California high court's decision to deny a petition for review is

22    not a decision on the merits, but rather means no more than that the court has decided not

23

24    —————————————

25      [4] Respondent argues that Claims One and Two are partly procedurally defaulted. (Answer at 11-14, 30). However, the Court will not address these issues since the Court retains the discretion to address

26    and deny the claims on the merits even if Petitioner's claims have been procedurally defaulted. See Flournoy v. Small, 681 F.3d 1000, 1004 n. 1 (9th Cir. 2012) ("While we ordinarily resolve the issue of

27    procedural bar prior to any consideration of the merits on habeas review, we are not required to do so when a petition clearly fails on the merits."); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002)

28    ("[C]ourts are empowered to, and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar.").

1  to consider the case on the merits."); Camper v. Workers' Comp. Appeals Bd., 3 Cal.4th
2  679, 689 n. 8 (1992) ("[W]e reiterate the well-established rule in this state that a denial of a
3  petition for review is not an expression of opinion of the Supreme Court on the merits of the
4  case.").  "Where there has been one reasoned state judgment rejecting a federal claim, later
5  unexplained orders upholding that judgment or rejecting the same claim rest upon the same
6  ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); accord Medley v. Runnels, 506
7  F.3d 857, 862 (9th Cir. 2007) (en banc), cert. denied, 552 U.S. 1316 (2008).  Thus, in
8  addressing part of Grounds One and Two, as well as the entirety of Ground Three, the
9  Court will consider the reasoned opinion of the California Court of Appeal, which denied the
10  claims on the merits.[5]  See Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010); Vasquez v.
11  Kirkland, 572 F.3d 1029, 1035 (9th Cir. 2009), cert. denied, 130 S.Ct. 1086 (2010).

12  　　　Because the Court finds that the remaining portions of Grounds One and Two fail
13  even under de novo review, Petitioner is not entitled to habeas corpus relief on these
14  claims.  See Norris v. Morgan, 622 F.3d 1276, 1290 (9th Cir. 2010), cert. denied, 131 S.Ct.
15  1557 (2011) (affirming denial of habeas corpus petition when claim failed even under de
16  novo review); Frantz v. Hazey, 533 F.3d 724, 735-37 (9th Cir. 2008) (en banc) (a federal
17  habeas court can review constitutional issues de novo before performing a § 2254(d)(1)
18  analysis).

19  　　　　　　　　　　　　　　　**DISCUSSION**

20  **I.**　　**GROUND ONE DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

21  　　　In Ground One, Petitioner claims that the trial court violated his due process right to
22  present a defense when it excluded "all . . . evidence that the eyewitnesses may have
23  misidentified the other robbery suspect."  (Petition at 5.)

24  / / /

25

26  _____

　　[5] Although the California Court of Appeal did not expressly cite federal constitutional law in rejecting
27  Petitioner's insufficiency of the evidence challenge in Ground Three, (LD 7 at 7-9), the claim was
presented to the state court, (LD 4 at 3), and Petitioner has not rebutted the strong presumption that the
28  Court of Appeal nevertheless adjudicated this claim on the merits.  See Johnson v. Williams, __ U.S.
__, 133 S.Ct. 1088, 1096 (2013).

### A.    California Court of Appeal Decision

The California Court of Appeal set forth the following facts underlying this claim:

> Devin Lutcher was charged along with defendant in this case. On the day jury selection began, the prosecutor dismissed the case against Lutcher. The prosecutor explained the circumstances that led him to charge Lutcher, then to dismiss the case against him: "The victims on this case, what they ended up doing after they were robbed, they got some photographs from Facebook. Some of those included [defendant]. Some of those included Mr. Devin Lutcher. Based on that, they informed the police that these two individuals were the ones who ended up robbing them at the home. [¶] Both of these individuals were picked up and arrested. Six-packs are shown of Mr. Lutcher to the victims. The victims at some point identified Mr. Lutcher. And then at the preliminary hearing, again, all the victims, there are three victims, identify Mr. Lutcher as being the individual who was in the house with the gun, along with [defendant]. [¶] What occurred thereafter was that information came down that there might be a person who looks extremely similar to Mr. Lutcher. My I.O. did some investigation and came across a photograph of another individual by the name of Parvin Tanner [phonetic], who does look remarkably like Mr. Lutcher.... [T]here was further information that Mr. Lutcher, roughly about an hour after this event occurred, was actually down in downtown being fired from his employer at the Ritz–Carlton. So we have verification of that. [¶] Now, having all that information, it then became incumbent upon me as to whether I was going to go forward as to Mr. Lutcher or not. [¶] Again, just based on personal knowledge of what I know the traffic pattern to be like going from here [Lancaster] to downtown on a Tuesday morning, it is difficult, but not impossible, to make it down there. [¶] On the other

hand, I did have this information that Parvin Tanner looked extremely like Mr. Lutcher. My I.O. contacted Parvin Tanner, asked him some questions. Parvin Tanner never admitted to being involved in the case, although he's made some statements like, well, my fingerprints might be in the house because I might have been there some time at a prior event, and then gave no further information. [¶] So, again, based on all that information, it was the prosecution's belief that our case may not rise to the level to proceed forward, and that's why I announced unable to proceed. I didn't dismiss under 1385. I said, we were unable to proceed because we have insufficient evidence at this point."

The prosecutor also told the court that his investigating officer had nothing to do with his decision not to proceed against Lutcher at that time, and emphasized that "at this point, we don't know if there is a misidentification or not." He continued, "I have just stopped the prosecution as to Mr. Lutcher based on the standards that I, as a prosecutor, have to meet at certain points."

Defense counsel informed the court that he wanted "to ask the detective, you went to Los Angeles a few days ago? You were there to speak to the employers of Mr. Lutcher, who was the taller defendant in this case? And based on your investigation, you learned that he was at an exit interview at his employer's office in downtown Los Angeles at ten o'clock on the day of the robbery? [¶] And I'd like to further ask him: On December 7th of this year, you interviewed a man at the Central Jail named Parvin Tanner and he appeared to you to look—to resemble Mr. Lutcher? [¶] You spoke to him about his possible involvement in the case? [¶] You asked a ruse question to try to get a response? [¶] You told him that his fingerprints were found at the crime scene when they

were really not? [¶] And then he looked down at his shoes and said something about, 'Maybe I was there in the past.'"

Defense counsel continued, "I want to be able to ask the witnesses: At the preliminary hearing, you identified that [*sic*] Mr. Lutcher as the gunman; correct? You pointed him out in court. You were very sure that the tall defendant that you saw in court was the gunman. [¶] Would you change your mind if you knew that someone else is being investigated as being the tall intruder? And the person you ID.ed [*sic*] is no longer being charged at this time? [¶] I think that is proper impeachment based on a person's, a witness's ability to perceive events and to recollect those events. This case is all about eyewitness identification. And if they have identified somebody who can be shown wasn't there, that was actually in downtown Los Angeles that morning, that reflects on their ability to accurately identify my client. And it is something I really need to explore with these witnesses."

The prosecutor objected that statements made to his investigator by Lutcher's employer and Tanner were hearsay. With respect to the victim witnesses, the prosecutor objected, "There is no impeachment in this case because there is no proof, there is no evidence that Parvin Tanner or some other individual committed this crime. The reason I dismissed this case is because I have my standard as a prosecutor to abide by in order to go forward in the case. [¶] I don't know if I met that standard or not; and, therefore, I dismissed this case. However, it may be that all the Blaylocks are absolutely correct when they say it was Devin Lutcher who did the robbery, that he's the one who had the gun. So there is no impeaching them at this point. There is nothing to impeach them with."

Defense counsel noted that the prosecutor had told him that he had instructed his investigator not to show the victim witnesses a photograph of Tanner, and counsel would like to question the investigator about why he did not show them the photograph. He added that he would like to show Tanner's photograph to the jury.

The trial court excluded all evidence regarding Tanner pursuant to Evidence Code section 352. (Undesignated section references are to the Evidence Code.) The court explained that the evidence regarding Tanner was not "even a classic case of impeachment because at this time, it sounds like, if anything, there is ongoing investigation as to Mr. Lutcher. So at this point, that would entail a mini trial and probable undue speculation by the jurors in terms of impeachment value of these victims as to Mr. Lutcher. He is not in issue. Their identification, however accurate it might be, should be focused on Mr. Jones, not Mr. Lutcher. [¶] The Court, under [section] 352, finds that any probative value regarding this additional evidence would be substantially outweighed by these concerns."

The court continued, "What I am going to allow questioning, and then I am going to cut it off after this point, is you will be allowed to ask anything regarding six-pack identifications regardless of whether it is [defendant] or Mr. Lutcher. But for [section] 352 reasons, we will not be going into the site [*sic*] investigations or site [*sic*] concerns as to Mr. Lutcher and this gentleman, Mr. Tanner.... [F]or similar reasons, that photo showing Mr. Tanner and Mr. Lutcher side by side will not be mentioned nor will it be shown to the witnesses. It has very little, if any, probative value as to their identification as to Mr. Jones."

The court added, "Similarly, the additional facts elicited, separate and apart from the fact that it would be hearsay to—for the investigating

officer to testify as to what Mr. Lutcher's employer said, the court

similarly has [section] 352 concerns regarding this, speculating as to

the time to drive from [*sic*] the Ritz–Carlton. That, again, puts the focus

on Mr. Lutcher, not [defendant]. So under [section] 352, and I will note

this is over defense objection, those types of details will be excluded."

(LD 7 at 9-13; <u>see</u> RT at 2-7, 340-48.)  The appellate court proceeded to reject Petitioner's

claim as follows:

> Defendant contends that the trial court abused its discretion and
>
> violated defendant's confrontation and due process rights by excluding
>
> evidence that Jesse, Lashawn, and Scales may have misidentified
>
> Lutcher as defendant's accomplice and evidence of the prosecution's
>
> decision to dismiss the case against Lutcher. He argues that such
>
> evidence was relevant to show that the victim witnesses' identification
>
> of defendant "was quite possibly similarly flawed." He further argues
>
> that introducing such evidence would not have resulted in a mini-trial or
>
> unduly consumed time because "[n]one of the evidence was
>
> complicated and would not have taken long to present." Defendant
>
> further argues that testimony by the prosecutor's investigator regarding
>
> statements made by Lutcher's employer and by Tanner would not have
>
> been hearsay because he would not have been offering such
>
> statements for their truth, but to instead explain why the prosecutor
>
> dismissed the case against Lutcher. In addition, he argues, Tanner's
>
> statements were a declaration against interest. Defendant argues he
>
> also should have been able to ask Eisen about the possible
>
> misidentification because hypothetical questions based upon the facts
>
> of a case are permissible.
>
> Evidence is relevant if it has any tendency in reason to prove or
>
> disprove any disputed fact of consequence to the determination of an

action. (§ 210.) Section 352 provides that the court may, in its discretion, exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will either be unduly time consuming or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury.

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) This standard of review applies to both a trial court's determination of the relevance of evidence and its determination under section 352 of whether the evidence's probative value is substantially outweighed by its prejudicial effect. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

We first address the trial court's exclusion of evidence of the prosecutor's dismissal of the case against Lutcher. Defendant did not seek to introduce evidence of the dismissal. Indeed, defense counsel expressly agreed with the trial court when the court stated that the dismissal of Lutcher had no relevance and would "result in mini trial and cause undue speculation under [section] 352." Accordingly, that issue was not preserved for appeal.

As far as the record reveals, the robbery began about 7:50 a.m. and lasted approximately 30 minutes. Accordingly, it would appear that more than one hour elapsed between the conclusion of the robbery and Lutcher's meeting with his employer in downtown Los Angeles. The prosecutor noted that it was difficult, but not impossible to travel from Lancaster to downtown in an hour. Thus, Lutcher's alibi for 10:00 a.m. did not establish that he was not defendant's accomplice in the commission of the charged crimes. Similarly, Tanner's statements

about his fingerprints did not establish that he was the actual accomplice. Defense counsel, who had seen a photograph of Tanner, did not dispute the prosecutor's assertion that Tanner looked "remarkably like Mr. Lutcher." Because the two men were "remarkably" similar in appearance and it had not been established that Tanner, not Lutcher, was defendant's accomplice, the possibility that the victims misidentified Lutcher had no tendency to show that they also misidentified defendant. Indeed, given the "remarkably" similar appearance of Lutcher and Tanner and the failure of police to show the victims a photograph of Tanner, any mistake by the victims in selecting Lutcher's photo was reasonable and had no tendency to show that they lacked the ability to accurately identify defendant as one of the robbers. Accordingly, the inference defendant hoped to have jurors draw would have been based only upon speculation that (1) Tanner was the actual accomplice, (2) the victims would not have selected Tanner if given an opportunity to compare him to Lutcher, and (3) the victims' purported inability to select the correct man from two remarkably similar-looking men suggested they also misidentified defendant, who had a distinctive piercing that the victims saw during the robbery but which was not shown in defendant's photograph in the six-pack array, and whom each victim had seen on at least one prior occasion. The "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684 (*Babbitt*).)

In addition, as the trial court concluded, evidence that the victims might have misidentified Lutcher would have necessitated a mini-trial regarding whether Lutcher or Tanner was defendant's accomplice. In addition to defendant's attempt to prove that Tanner was the accomplice, the prosecutor, who did not concede the victims had

misidentified Lutcher, would probably have attempted to show that Lutcher could have been the accomplice and, even if he was not, that any mistake by the victims was reasonable. Because a possible mistake in identifying Lutcher was irrelevant to defendant's guilt, this would have caused an *undue* consumption of time, even if, in absolute terms, it did not consume very much time. Of equal importance, it would have diverted the jury's focus to an irrelevant issue and potentially have misled the jury or confused the issues.

In addition, testimony by the prosecutor's investigator regarding statements by Lutcher's employer to the effect that Lutcher was at his workplace at 10:00 a.m. on the day of the robbery would have been hearsay. Defendant wanted to use that statement to show that Lutcher had an alibi for the time of the robbery, and was thus seeking to introduce such a statement for its truth.

Accordingly, we conclude the trial court did not abuse its discretion by excluding the evidence regarding Lutcher's partial alibi and the possibility that Tanner was defendant's accomplice.

Although "Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense" (*People v. Cunningham* (2001) 25 Cal.4th 926, 999), neither the right to present a defense nor the right to confront witnesses permits a defendant to introduce irrelevant or marginally relevant evidence. (*Babbitt*, *supra*, 45 Cal.3d at p. 684; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431].) Accordingly, the trial court's ruling did not violate defendant's rights to due process or confrontation.

(Id. at 13-16.)

/ / /

**B.   Applicable Law**

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citation omitted); Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  This right includes the ability to call witnesses and present evidence in one's own defense.  Taylor v. Illinois, 484 U.S. 400, 408 (1988); Chambers v. Mississippi, 410 U.S. 284, 294 (1973).  Even so, there is no requirement "that a defendant must be allowed to put on any evidence he chooses."  LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir.1998).  Rather, the defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence ."  Chambers, 410 U.S. at 302; Crane, 476 U.S. at 690.  Thus, a criminal defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  Taylor, 484 U.S. at 410; Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983), cert. denied, 496 U.S. 838 (1984).  Indeed, "any number of familiar and unquestionably constitutional evidentiary rules . . . authorize the exclusion of relevant evidence[,]" Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (plurality opinion); LaGrand, 133 F.3d at 1266-67, and states have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  United States v. Scheffer, 523 U.S. 303, 308 (1998) (citations omitted); Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002).

"Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected."  Lincoln v. Sunn, 807 F.2d 805, 816 (9th Cir. 1987).  "The state court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due process rights."  Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990), cert. denied, 498 U.S. 1091 (1991); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  In Tinsley, the Ninth Circuit articulated five factors to be considered in evaluating whether the exclusion of evidence reaches constitutional proportions: (1) the

probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. 895 F.2d at 530.  After consideration of these factors, the importance of the evidence must be balanced against the state interest in exclusion.  See id. at 530; see also Chia v. Cambria, 360 F.3d 997, 1003-04 (9th Cir. 2004), cert. denied, 544 U.S. 919 (2005).  The exclusion of evidence that is highly reliable and relevant to the defense may violate due process.  Green v. Georgia, 442 U.S. 95, 97 (1979) (per curiam); Chambers, 410 U.S. at 300-02.

**C.     Analysis**

**1.     Evidence That The Case Against Lutcher Was Dismissed**

In an attempt to impeach the robbery victims' identifications of Petitioner as one of the robbers, Petitioner sought to introduce evidence that the prosecutor dismissed the case against Lutcher, who was identified as Petitioner's co-perpetrator by the robbery victims. (RT at 343.)  The trial court refused to allow this evidence, finding that it was irrelevant and would result in a mini-trial and cause undue speculation under Cal. Evidence Code § 352.[6] (RT at 346-47; see RT at 5-7.)  Petitioner contends that the trial court violated Petitioner's due process rights because the excluded evidence was crucial to Petitioner's defense and would have allowed the defense to argue that "if the victims were mistaken as to the other suspect, their identifications of petitioner were also unreliable."  (See Memo. at 3-4.) Petitioner's contentions are unpersuasive.

The California Court of Appeal concluded that Petitioner had forfeited his challenge to the exclusion of evidence concerning the prosecution's dismissal of the case against Lutcher.  (LD 7 at 14.)  Because the Court finds that this claim fails even under de novo

---

[6]  Cal. Evid. Code § 352 provides as follows:

> The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

1   review, Petitioner is not entitled to habeas corpus relief on this ground.  See Norris, 622

2   F.3d at 1290; Frantz, 533 F.3d at 735-37.

3          Petitioner has not demonstrated that the trial court's exclusion of evidence

4   concerning the prosecution's dismissal of the case against Lutcher rendered Petitioner's trial

5   fundamentally unfair.  See Scheffer, 523 U.S. at 315 (The exclusion of evidence pursuant to

6   a state evidentiary rule is unconstitutional only where it "significantly undermined

7   fundamental elements of the defendant's defense.").  The fact that the prosecutor did not

8   proceed in prosecuting a co-perpetrator was, at most, only exculpatory as to the co-

9   perpetrator; this fact was neither relevant nor material to the issue of Petitioner's guilt.  Any

10  evidence that the prosecutor dismissed its case against Luchter in support of the claim that

11  Petitioner was not guilty was purely speculative.  To the extent Petitioner challenges the

12  exclusion of evidence concerning the reasons for the dismissal, i.e., the existence of

13  evidence suggesting the victims' identifications of Lutcher may have been mistaken, there is

14  also no merit to this contention as discussed more fully below.  See infra at § I.C.2.

15  Accordingly, the trial court's exclusion of the evidence at issue did not render Petitioner's

16  trial fundamentally unfair.  Scheffer, 523 U.S. at 315; Holmes, 547 U.S. at 326 (trial court

17  may exclude evidence when its probative value is outweighed by its potential to confuse

18  issues).  Petitioner is not entitled to federal habeas relief on this claim.

19          **2.     Evidence Regarding Lutcher's Alibi and the Investigation of**

20              **Tanner as a Possible Second Robber**

21          Petitioner also sought to introduce evidence concerning Lutcher's alibi and the

22  investigation of Tanner as a possible second robber in order to impeach the victims'

23  identifications of Petitioner based on the fact that their identifications of Lutcher had been

24  unreliable.  (RT at 342-43.)  The trial court similarly refused to allow this evidence because it

25  was marginally relevant at best and would result in a mini-trial and cause undue speculation

26  under Cal. Evidence Code § 352.  (RT at 346-47.)  Petitioner contends that the trial court

27  violated Petitioner's due process rights because the excluded evidence was crucial to

28  Petitioner's defense and would have allowed the defense to challenge the victims'

identifications of Petitioner as unreliable on the ground that "[they] were mistaken as to the other suspect[.]"  (See Memo. at 3-4.)  Petitioner's contentions are unpersuasive.

The California Court of Appeal reasonably rejected Petitioner's due process challenge to the trial court's exclusion of evidence regarding Lutcher's alibi and the investigation of Tanner as a possible second robber.  It was not unreasonable for the appellate court to conclude that the evidence in question was inadmissible hearsay and/or marginally relevant at best to the issue of Petitioner's guilt, and that its admission would lead only to speculative inferences. (LD 7 at 14-15.)  Petitioner sought to introduce evidence that the victims might have misidentified Lutcher as the second robber, including evidence that: (1) at 10:00 a.m. on the Tuesday morning when the robbery occurred, i.e., more than one hour after the robbery ended in Lancaster around 8:20 a.m., Lutcher was meeting with his employer in downtown Los Angeles, (RT at 342-43; see LD 7 at 2; RT at 708); and (2) another individual named Parvin Tanner, who looked "remarkably" like Lutcher, stated his fingerprints "might" have been in the victims' house because he might have been there some time prior to the burglary, (RT at 341-43).  However, the Court of Appeal reasonably concluded that Lutcher's 10:00 a.m. alibi did not establish he was not Petitioner' co-perpetrator since, as the prosecutor noted, it is not impossible to travel from Lancaster to downtown Los Angeles in one hour on a Tuesday morning.  (RT at 341; see LD 7 at 14.)  Moreover, as the Court of Appeal reasonably found, Tanner's statements concerning his fingerprints also do not establish that he was Petitioner's accomplice.  (LD 7 at 14.)  In any event, the Court of Appeal reasonably concluded that, given the evidence of Lutcher's remarkable resemblance to Tanner, and in light of the fact that the police did not show the victims Tanner's picture, any mistake by the victims in identifying Lutcher would have been reasonable and did not tend to show the victims' inability to accurately identify Petitioner. (LD 7 at 14.)  The Court of Appeal was not unreasonable, therefore, in finding that the relevance of the evidence at issue was not high in relation to the question of Petitioner's guilt.  (LD 7 at 14-15)

Moreover, introduction of evidence that the victims might have misidentified Lutcher would have required a mini-trial regarding whether Lutcher or Tanner was Petitioner's accomplice, and whether any misidentification of Lutcher would have discredited the victims' identifications of Petitioner.  This would have caused an undue consumption of time and carried the risk of confusing the jury, as the appellate court reasonably concluded.  (LD 7 at 15.)  Thus, the appellate court was not unreasonable in concluding that the exclusion of the evidence regarding Lutcher's alibi and the investigation of Tanner as a possible second robber pursuant to Cal. Evidence Code § 352 did not violate Petitioner's right to due process.  (LD 7 at 15-16); Scheffer, 523 U.S. at 315; Holmes, 547 U.S. at 326.

Furthermore, Petitioner's contention that the trial court impermissibly excluded the evidence at issue, because it was crucial to Petitioner's defense and would have allowed the defense to discredit the victims' identifications of Petitioner, constitutes a challenge to the manner in which the trial court exercised its discretion under Cal. Evidence Code § 352. See Moses v. Payne, 555 F.3d 742, 758 (9th Cir. 2009) ("Because Moses could not successfully argue that [an evidentiary rule requiring a trial court to balance factors and exercise its discretion] by its terms infringed his constitutional right to present a complete defense, Moses's argument is best interpreted as challenging the trial court's exercise of discretion in this case to exclude [the contested] testimony.").  However, "the Supreme Court's cases [addressing the intersection of state evidentiary rules and the right to present a defense] have focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence."  Id. at 758; Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011).  "These cases do not squarely address whether a court's exercise of discretion to exclude . . . testimony violates a criminal defendant's constitutional right to present relevant evidence. Nor do they clearly establish 'a controlling legal standard' for evaluating discretionary decisions to exclude the kind of evidence at issue here."  Moses, 555 F.3d at 758-59 (citations omitted); see also Brown, 644 F.3d at 983 ("Between the issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete

defense or 'establish[ing] a controlling legal standard' for evaluating such exclusions."). In the absence of Supreme Court precedent, Petitioner is not entitled to habeas corpus relief on this claim because the California Court of Appeal's decision upholding the trial court's exercise of its discretion cannot be contrary to, or an unreasonable application of, clearly established federal law. Brown, 644 F.3d at 983; Moses, 555 F.3d at 757-60; see also Wright, 552 U.S. at 126 ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law. Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.") (internal quotation marks and citation omitted; brackets in original); Carey, 549 U.S. at 77 ("Given the lack of holdings from this Court . . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'") (internal citation omitted); Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law.").

*      *      *

Accordingly, Petitioner is not entitled to federal habeas relief on Ground One.

## II.    GROUND TWO DOES NOT WARRANT FEDERAL HABEAS RELIEF.

In Ground Two, Petitioner contends that the trial court violated his Sixth Amendment right to confrontation by not permitting him to confront the victims with evidence that they might have misidentified Lutcher as the second robber. (Petition at 7; Memo. at 4-5.)

### A.    Applicable Law

Under the Confrontation Clause of the Sixth Amendment, a defendant has the right to cross-examine adverse witnesses. Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986); Davis v. Alaska, 415 U.S. 308, 316 (1974). However, "'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Van Arsdall, 475 U.S. at 679 (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). Trial judges retain

"wide latitude" to impose reasonable limits on cross-examination based on such concerns as prejudice, harassment, confusion of the issues, and limiting interrogation that is only marginally relevant.  Id. at 679.  A Confrontation Clause violation occurs when a reasonable jury might have received "a significantly different impression of [the witness's] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination."  Id. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009); see also United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999), cert. denied, 530 U.S. 1277 (2000) (to determine whether limitation of cross-examination violated Confrontation Clause, a court must ask whether: (1) the excluded evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interest in presenting it; and (3) the exclusion of evidence left the jury with sufficient information to assess the witness's credibility).

### B.   Right To Confront The Victims With Evidence That The Case Against Lutcher Was Dismissed

The California Court of Appeal concluded that Petitioner forfeited his claim challenging the inability to confront the victims with evidence of the prosecution's dismissal of the case against Lutcher.  (LD 7 at 14.)  Because the Court finds that this claim fails even under de novo review, Petitioner is not entitled to habeas corpus relief on this claim.  See Norris, 622 F.3d at 1290; Frantz, 533 F.3d at 735-37.

As previously mentioned, the evidence that the prosecutor did not proceed in prosecuting Lutcher was tangential at best and of limited value to assessing Petitioner's guilt.  Indeed, additional evidence regarding inter alia the investigation of the second robber and the circumstances of the victims' identifications of each Lutcher and Petitioner would have been essential to evaluate whether the victims actually misidentified Lutcher, and if so, whether their misidentification of Lutcher would discredit their identification of Petitioner, thus requiring a time-consuming mini-trial with the potential of confusing the jury.  See Van Arsdall, 475 U.S. at 679 (trial court may limit cross-examination regarding matters that are only marginally relevant and may confuse the jury).

Moreover, defense counsel extensively cross-examined the witnesses regarding the victims' identifications, recollections, perceptions, and observations of Petitioner and the home invasion.  (See, e.g., RT at 638-45, 649-51, 675-83, 685, 702-13, 717, 726-35.) Defense counsel questioned Jesse's memory of defense counsel (RT 638-640), his "lazy" eye problem (RT 649-50), the strength of his and Lashawn's six-pack identifications of Petitioner (RT 641-643, 682-83), and Jesse's, Lashawn's, and Lashawnda's failure to mention a tattoo on Petitioner's neck, (RT 644, 679-81, 705-06, 717, 727).  As such, it cannot be said that the exclusion of the evidence concerning the prosecution's dismissal of its case against Lutcher left the jury with insufficient information to assess the credibility of the victims.  Beardslee, 197 F.3d at 383.

In sum, the trial court's restriction of cross-examination of the victims concerning the prosecution's dismissal of the case against Lutcher did not violate Petitioner's confrontation rights, because the evidence would not have produced a significantly different impression of the victims' credibility.  The relevance of the excluded evidence was not high, there were legitimate interests outweighing Petitioner's interest in presenting it, and the impeachment evidence before the jury provided it with sufficient information to assess the victims' credibility.  Beardslee, 197 F.3d at 383.

**C.      Right To Confront The Victims With Evidence Regarding Lutcher's Alibi And The Investigation Of Tanner As A Possible Second Robber**

Concerning Petitioner's remaining contentions that the trial court impermissibly prevented him from confronting the victims with evidence concerning Lutcher's alibi and the investigation of Tanner as a possible second robber, the California Court of Appeal concluded that the trial court did not violate Petitioner's Sixth Amendment right to confrontation, finding that the evidence at issue was inadmissible hearsay and/or marginally relevant at best and that its admission would lead only to speculative inferences. (LD 7 at 14-15.)  The Court of Appeal reasoned that introduction of evidence that the victims' might have misidentified Lutcher would have required a mini-trial regarding whether Lutcher or Tanner was Petitioner's accomplice, moreover, an issue ultimately irrelevant to Petitioner's guilt.  This would have caused an undue

consumption of time and carried the risk of confusing the jury, according to the appellate court. (LD 7 at 15.)

The California Court of Appeal reasonably rejected Petitioner's Confrontation Clause challenge to the trial court's restriction on cross-examination of the witnesses with evidence regarding Lutcher's alibi and the investigation of Tanner as a possible second robber.  As discussed above, see supra at § I.C.2., the court of appeal reasonably found none of the evidence established that Tanner rather than Lutcher was in fact the second robber.  Moreover, even if it could be shown that Tanner was in fact the second robber, the appellate court reasonably concluded the victims' misidentifications of Lutcher would not have been unreasonable given the evidence that Lutcher and Tanner resembled each other.  As such, the victims' misidentifications of Lutcher would not have discredited their identifications of Petitioner.  Also, introduction of evidence that the victims might have misidentified Lutcher would have required a mini-trial regarding whether Lutcher or Tanner was Petitioner's accomplice, and whether any misidentification of Lutcher would have discredited the victims' identifications of Petitioner.  This would have caused an undue consumption of time and carried the risk of confusing the jury, as the appellate court reasonably concluded.  (LD 7 at 15.)  The Court of Appeal was not unreasonable, therefore, in finding that the relevance of the evidence at issue was not high in relation to the question of Petitioner's guilt, and that there were legitimate interests outweighing Petitioner's interest in presenting this evidence.  (LD 7 at 14-15); Beardslee, 197 F.3d at 383; Van Arsdall, 475 U.S. at 679.

Finally, as discussed above, see supra at § II.B., the impeachment evidence before the jury provided it with sufficient information to assess the victims' credibility.  Beardslee, 197 F.3d at 383.  In sum, the appellate court was not unreasonable in concluding that the trial court did not violate Petitioner's Sixth Amendment right to confrontation by restricting his cross-examination of the victims concerning Lutcher's alibi and the investigation of Tanner as a possible second robber.  Beardslee, 197 F.3d at 383.

\*       \*       \*

Accordingly, Petitioner is not entitled to federal habeas relief on Ground Two.

**III.    GROUND THREE DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

In Ground Three, Petitioner contends that there was insufficient evidence to support his conviction for first degree residential robbery of four or five-year old Vincent. (Petition at 8; Memo. at 5-6.)  Specifically, he challenges the evidence that Vincent had constructive possession of any of the items stolen.  (Petition at 8; Memo. at 5-6.)

**A.    California Court of Appeal Decision**

The California Court of Appeal rejected Ground Three as follows:

> Defendant contends the evidence was insufficient to support his conviction for robbing Vincent because "no personal property of [Vincent's] was taken" and "given his age, he did not have constructive possession over any of the property."

> To resolve this issue, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) We presume the existence of every fact supporting the judgment that the jury could reasonably deduce from the evidence and make all reasonable inferences that support the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

> Robbery is defined as the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property. (Pen. Code, § 211; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) Robbery is an offense against the person. (*People v. Weddles* (2010) 184 Cal.App.4th 1365, 1369 (*Weddles*).) Any person who owns or who exercises direct physical control over, or who has constructive possession of, any property taken

may be a victim of a robbery if force or fear is applied to such person. (*People v. Scott* (2009) 45 Cal.4th 743, 749–750 (*Scott*).)

"Constructive possession does not require an absolute right of possession. 'For the purposes of robbery, it is enough that the person presently has some loose custody over the property, is currently exercising dominion over it, or at least may be said to represent or stand in the shoes of the true owner.'" (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 497.) "For constructive possession, courts have required that the alleged victim of a robbery have a 'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Scott*, *supra*, 45 Cal.4th at p. 750.) "By requiring that the victim of a robbery have possession of the property taken, the Legislature has included as victims those persons who, because of their relationship to the property or its owner, have the right to resist the taking, and has excluded as victims those bystanders who have no greater interest in the property than any other member of the general population." (*Id.* at pp. 757–758.) Civil Code section 50 establishes the right to use "necessary force" to protect the "property of oneself, or of a wife, husband, child, parent, or other relative, or member of one's family. . . ." Several published cases have upheld against insufficiency of evidence claims convictions for robbing victims of property belonging to their family members. (*People v. Gordon* (1982) 136 Cal.App.3d 519 [parents robbed of marijuana belonging to their adult son]; *DeFrance*, 167 Cal.App.4th 486 [mother robbed of car owned by her adult son]; *Weddles*, *supra*, 184 Cal.App.4th 1365 [man robbed of his brother's money].)

"Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Scott*, *supra*, 45 Cal.4th at p. 750.)

Vincent was four or five years old at the time of the robbery. The jury was instructed on actual and constructive possession and heard defense counsel's argument that Vincent was too young to be in possession of any property taken from the home.

Under Civil Code section 50, Vincent had authority to protect his parents' property, and thus had constructive possession of the money and other property that the robbers took. Vincent was not too young to be either unaware of the robbery or unable (if not forced into the bathroom) to resist the taking of his parents' property, by, for example shouting, phoning, or running to the home of a neighbor for help; running away with the property; or hiding the property. Lashawn's testimony that she comforted Vincent when they were forced into the bathroom supports a reasonable inference that Vincent was aware of the robbery. Notably, Scales wanted to put Vincent through the bathroom window so that he could go and get help. Had she done so, Vincent could have run to a neighbor's home and asked a neighbor to phone 911. Defendant and his accomplice apparently considered it sufficiently necessary to overcome potential resistance by Vincent that they forced him into the bathroom with his mother and Scales.

Because multiple people may simultaneously possess a single item of personal property, the presence of Vincent's parents and Scales did not divest Vincent of his statutory authority to protect, or constructive possession of, his parents' property. "When two or more persons are in joint possession of a single item of personal property,

the person attempting to unlawfully take such property must deal with all such individuals. All must be placed in fear or forced to unwillingly give up possession. To the extent that any threat may provoke resistance, and thus increase the possibility of actual physical injury, a threat accompanied by a taking of property from two victims' possession is even more likely to provoke resistance. [¶] We view the central element of the crime of robbery as the force or fear applied to the individual victim in order to deprive him of his property. Accordingly, if force or fear is applied to two victims in joint possession of property, two convictions of robbery are proper." (*People v. Ramos* (1982) 30 Cal.3d 553, 589, reversed in part on other grounds in *California v. Ramos* (1983) 463 U.S. 992 [103 S.Ct. 3446].)

We conclude that defendant's conviction of robbing Vincent was supported by both the law and substantial evidence.

(LD 7 at 7-9.)

### B.   Applicable Federal Law

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  However, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), cert. denied, 546 U.S. 1137 (2006).  In particular, to review the sufficiency of the evidence in a habeas corpus proceeding, the court must determine whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Lewis v. Jeffers (Jeffers), 497 U.S. 764, 781 (1990) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (italics in original).  All evidence must be considered in the light most favorable to the prosecution, Jeffers, 497 U.S. at 782; Jackson, 443 U.S. at 319, and if the facts support conflicting inferences,

1  reviewing courts "must presume – even if it does not affirmatively appear in the record – that

2  the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

3  resolution." Jackson, 443 U.S. at 326; McDaniel v. Brown, 130 S.Ct. 665, 673 (2010) (per

4  curiam).  These standards are applied to the substantive elements of the criminal offenses

5  under state law.  See Jackson, 443 U.S. at 324 n.16; Chein v. Shumsky, 373 F.3d 978, 983

6  (9th Cir.) (en banc), cert. denied, 543 U.S. 956 (2004).

7       **C.   Analysis**

8       Under California law, "[r]obbery is the felonious taking of personal property in the

9  possession of another, from his person or immediate presence, and against his will,

10  accomplished by means of force or fear."  Cal. Penal Code § 211; People v. Nguyen, 24

11  Cal. 4th 756, 761 (2000).  Further, California law limits victims of robbery to those persons

12  in either actual or constructive possession of the property taken.  See Nguyen, 24 Cal.4th at

13  764.  Thus, "[t]here is no requirement that the victim have an absolute right to possession of

14  the property."  People v. Hamilton, 40 Cal. App. 4th 1137, 1143 (1995).  "[I]t is enough that

15  the person presently has some loose custody over the property, is currently exercising

16  dominion over it, or at least may be said to represent or stand in the shoes of the true

17  owner."  Id.  Constructive possession has been found where the alleged robbery victim has

18  a "'special relationship' with the owner of the property such that the victim had authority or

19  responsibility to protect the stolen property on behalf of the owner."  People v. Scott, 45 Cal.

20  4th 743, 750 (2009); see id. at 757-58 ("By requiring that the victim of a robbery have

21  possession of the property taken, the [California State] Legislature has included as victims

22  those persons who, because of their relationship to the property or its owner, have the right

23  to resist the taking, and has excluded as victims those bystanders who have no greater

24  interest in the property than any other member of the general population.").  Pursuant to

25  California Civil Code § 50, "[a]ny necessary force may be used to protect from wrongful

26  injury the . . . property of oneself, or of a wife, husband, child, parent, or other relative, or

27  member of one's family, or of a ward, servant, master, or guest."  Under California law,

28

1   therefore, a family member may be in constructive possession of property belonging to

2   another family member.  See, e.g., People v. Gordon, 136 Cal. App. 3d 519, 529 (1982).

3       Here, the California Court Appeal interpreted state law to find Vincent's familial

4   relationship with the owners of the stolen property (his parents) expressly fell within the

5   special relationships set forth in California Civil Code § 50 and approved by the California

6   Supreme Court. (LD 7 at 8-9; Scott, 45 Cal. 4th at 753-54, 757-58.)  This Court cannot

7   second-guess the state court's determination of state law.  See Bradshaw v. Richey, 546

8   U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one

9   announced on direct appeal of the challenged conviction, binds a federal court sitting in

10  habeas corpus.") (citations omitted); Hicks on behalf of Feiock v. Feiock, 485 U.S. 624, 629-

11  30 (1988) ("We are not at liberty to depart from the state appellate court's resolution of

12  these issues of state law.  Although petitioner marshals a number of sources in support of

13  the contention that the state appellate court misapplied state law on these two points, the

14  California Supreme Court denied review of this case, and we are not free in this situation to

15  overturn the state court's conclusions of state law.") (footnote omitted).

16      Moreover, the California Court of Appeal reasonably found that sufficient evidence

17  supported the conclusion that Vincent had constructive possession of the items stolen.  The

18  jury heard testimony from which it could infer that Vincent was aware of the circumstances

19  of the robbery because Lashawn felt the need to comfort him during the ordeal.  (RT at 660;

20  LD 7 at 8.)  As the California Court of Appeal reasonably determined, moreover, the

21  evidence amply demonstrated that he would have been able to resist Petitioner (by

22  shouting, hiding property, or running away to a neighbor's home) had he not been confined

23  by Petitioner during the commission of the offense.  (RT at 659-62; LD 7 at 8.)  In fact, as

24  the state appellate court reasonably concluded, the fact that Petitioner ordered Vincent to

25  remain in the bathroom with his mother and sister during the robbery was evidence that

26  Petitioner "considered it sufficiently necessary to overcome potential resistance by

27  Vincent[.]"  (LD 7 at 9; see RT at 659-661); see also People v. Ramos, 30 Cal. 3d 553, 589

28

(1982), reversed in part on other grounds in California v. Ramos, 463 U.S. 992 (1983) (recognizing robbery as a crime of violence against the person, such that when force or fear is used to take property jointly possessed by two or more persons, the robber may be convicted of a separate robbery for each victim to which force or fear was applied).  On this record, the court of appeal's determination that sufficient evidence supported Petitioner's conviction for first degree residential robbery of four or five-year old Vincent is a reasonable application of the standards of Jackson and Winship to the facts of this case. See In re Winship, 397 U.S. at 364; Jackson, 443 U.S. at 319; see also United States v. Larios, 640 F.2d 938, 940 (9th Cir.1981) ("The testimony of one witness . . . is sufficient to uphold a conviction.") (citations omitted); Bruce v. Terhune, 376 F.3d 950, 957-58 (9th Cir. 2004) (per curiam) (same); Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 851 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

## ORDER

Petitioner is not entitled to relief on the claims in his Petition.

Accordingly, IT IS HEREBY ORDERED that the Petition is denied, and Judgment shall be entered dismissing this action with prejudice.

DATED: May 1, 2014                          /s/John E. McDermott
                                            JOHN E. MCDERMOTT
                                    UNITED STATES MAGISTRATE JUDGE